51180, West Palm Beach Police Fund v. SelectQuote, Inc. So Mr. Harrod, before we start, I should let you know that before I fully understood that Mr. Andrews was going to argue this, he did speak to my class, my teacher class on securities and commodities fraud enforcement, but I think he actually was speaking in his capacity as a former prosecutor, so that might help you. Maybe he'll change his mind. Maybe. Good luck. Thank you. I hope you don't mind that. Of course not. Thank you, Your Honor. May it please the Court, good morning. I'm James Harrod from Bernstein, Litovitz, Berger & Grossman, and I represent the plaintiffs' appellants in this case. Among the district court's errors in dismissing the case below were failing to even address the non-fraud Securities Act claims, which we believe were sufficiently pled, to in finding that GAAP financial statements, that's generally accepted accounting principles, items which we allege to be false or forward-looking statements and thus not actionable at all, in making a factual determination in conflict or multiple factual determinations in conflict with the complaint's plain allegations and finding that the plaintiff's claims allege fraud by hindsight. And the court, the district court also dismissed statements about the training of select quotes agents on the grounds that they were immaterial. It is clear from the factual narrative that's pled in the complaint that these claims should not have been dismissed and should be reversed. I want to talk a little bit about the facts that we've pled in the complaint as context, especially for the financial statements that we allege to have been misstated under the accounting rules. Select Quote's business, it's a pure brokerage business. It generated the majority of its revenue during this relevant period from sales of Medicare policies to senior citizens. The company went public in May of 2020. Bad timing. Well, it was good timing for those people who sold the shares in Select Quote because they were sold in the IPO at $20 per share, and after the end of the class period they were worth $3.44. So a huge drop. It was a significant drop, which largely appreciated in connection with the disclosures we allege, which revealed previously undisclosed information. That high IPO valuation was fueled by an astounding amount of short-term growth. Between 2018, fiscal year 2018, and fiscal year 2020, the first year that the company was public, the sales in the senior division went from $100 million to $360 million. So two years, three and a half times or more growth in that business. The growth that scaled the size of the business allowed that high IPO valuation, and it benefited those insiders who sold the company's shares at those high prices. But the complaint details how that growth sacrificed quality, and the low quality of the sales, the brokerage sales that were made by Select Quote during this period of time, is really important, and it's important because they affected the persistency rates. Correct, Your Honor. That's exactly why. We allege that the growth was fueled by a departure from quality of sales and into this massive growth, which continued during the class period for the first year. A lot of people would consider that a salesman is well-trained if they sell a lot of what the company has to sell. Correct. I don't disagree with that statement, Your Honor, but I'm going to make a couple of qualifications. One is that the unit economics, if you read the record carefully, the unit economics of a sale of a Medicare policy requires that multiple renewals occur in order for there to be policy. There's a lot of upfront costs associated with the initial sale. So for Select Quote's business, they only made money on the policy if it was renewed at least three times. And so the importance of the salesperson and the fit and the quality of the sale was necessary for them to be able to make money. If they didn't do that, the company couldn't make money. And that's, in fact, what happened at the end of the class period and after. The EBITDA, which is a measure of profit, at the time of the IPO, the company disclosed was $725. They said, based on the amount of renewals that we expect, we're going to make $725 on each policy. In February of 22, 2022, that is, the company disclosed that its EBITDA per policy, the same number, was negative $143. So the only way that the unit economics for Select Quote's business work is if they have renewals. And when you do a high volume of sales, the renewals dropped off. And that's what we allege happened. So they built the business up so they could sell the shares at $20 per share. And they hired agents, as we allege, very indiscriminately. They misrepresented the disclosures. And Mr. Anders and I respectfully had a disagreement about this in the district court. But the disclosure is the agents have up to 10 weeks of training. Our complaint clearly alleges that they had four weeks of training. The defendant's response to that is, well, up to 10 weeks includes four. I would say up to 10 weeks. They actually said 10 weeks. They said 10 weeks. And they said there's an even more detailed disclosure where they say it's four weeks in a classroom and then six weeks beyond that. The question becomes how you connect that to the drop in the price. Because an attachment to your complaint indicates that one of the competitors had a more or less simultaneous drop of a similar weight over that same period of time. And the red brief indicates another competitor had another drop, which we could take judicial notice of because it's financial data. Right. So how do you connect the fact that ill-trained salesmen sold too many policies? It was a drop that seems to have affected an industry. Well, we connect that, one, in our reply brief, you'll see that there's a stock graph. The company that the defendants are comparing it to is a company called eHealth. You will look at that graph. I can find the page number for you. But it shows that SelectQuote's share price actually traded well above eHealth's on a relative performance basis until the very end of the class period. And so that contention, I think, is incorrect because if you had bought SelectQuote and you had bought eHealth at the same time, you would have bought eHealth at a less inflated amount. I don't know. I don't have claims against that. Maybe they did something similar. But the connection is that the company itself tied agent training and the quality of sales to the persistence. Maybe the question, which is also on my mind, is that if we could take some form of judicial notice of the fact that the downward turn affected the entire industry, right? Bad timing. Bad timing, maybe. Then what are we to make of that in connection with assessing your claims and the dismissal of those claims? I think you have to look at the – first of all, I respectfully disagree with the contention that it was an industry-wide phenomenon. There may have been an industry-wide phenomenon, but they're not precisely parallel. SelectQuote's share price was inflated for a period of time when eHealth had already begun underperforming. The company and the defendants actually distinguished their persistency from that particular competitor and said that their persistency was better. And they at various times, as we allege in the complaint, tied their persistency to their training of agents and the quality of their sales process. So I think that there's a distinction, and I think if you look at the totality of the allegations in our complaint, it tells a clear story that the persistency rates were misrepresented and those persistency rates were embedded in the company's financial disclosures and that the company admitted that prior to the IPO, the persistency rate declines and under the applicable accounting rules required them to revise and reduce. The argument on the other side is, as I understand it, that as to the persistency rates, those were largely forward-looking statements about what they anticipated. I understand, you know, you've got these other arguments about training or claims about hiring, training. But on the statements regarding persistency, that's the argument. There's no – they say – first of all, I want to start with basic principles. Under the PSLRA safe harbor, which covers – provides coverage for defendants for forward-looking statements, makes them harder to plead. The PSLRA specifically carves out from the safe harbor anything that's in GAAP financial statements. So they're not even alleging that the safe harbor applies to these statements as to the Exchange Act. As to the bespeaks caution doctrine, and this is what they're alleging, I would say – That's where I think we are.  The first matter is the statements – omissions and statements of present fact which are in the financial statements, which are the persistency rate that they used was a known fact to them at the time that those financial statements were issued. So that is not a forward-looking statement. Many accrual accounting disclosures are based on performance of future events. Accounts receivable are not money you have in hand. They're money that people owe you. They are not – you're making – you're making the assumption that people will pay you. And there are other provisions in the accounting that deal with what happens when they don't. But accounts receivable are not forward-looking statements. They cite no cases in support of this point. And I would say one more thing on just – on the doctrine of bespeaks caution in the context of GAAP financial statements in the safe harbor. Bespeaks caution has never been extended in the way that they are suggesting post-PSLRA. And I think that that's an important distinction because you're basically putting those two things in conflict with each other. Congress said if something's in the financial statements, the safe harbor doesn't apply. The position that they're advocating for would create a situation where bespeaks caution says, well, these can be – these can still be considered forward-looking and subject to the heightened pleading standard under bespeaks caution, even though the PSLRA says they're – they don't. Let me ask you – sorry. Of course. To speak one more point. This is on a motion to dismiss. Yes, Your Honor. What's your view, position, with respect to what avenue you might take on discovery if the motion to – if the case were returned, presumably, eventually, in your view, to the summary judgment of the first trial? Is it – what were you deprived of by it being a motion to dismiss the discredited? Well – Go ahead. Thank you. It's a really good question, Your Honor. What I think we're principally deprived of is the details regarding the company's renewal lapse insurance experience, the components that go into this persistency calculation. The company's financial disclosures and qualitative disclosures provide almost no information about the actual statistics involved in that. And so there's an ambiguity in the market, which we were – which deprived investors of having those details. So what I would get is the records of the actual renewal experience. Did the court address that question? It did not. I see that I'm well over my time, but Your Honor – Let's stop this here. When you describe the disclosure as to lifetime value as being governed by GAAP and that it's basically a financial report like accounts receivable. Correct. What do you make of the fact that your whole argument is based on the idea that it is subject – easily subject to manipulation because the inputs are so vulnerable to judgment and monkey business that it's not really – it isn't really reliable. It doesn't seem to resemble other kinds of financial reporting under GAAP. Well, they report – I'm inviting you to tell me why it does. The numbers are what a lot of things – I think – I don't think it's that different than something like loan loss reserves, which this Court has ruled on in the past and found are statements of present fact. There are no – I'm familiar with the DiCarlo decision, which finds that some of these kinds of financial statements may be considered opinion. I think as we put in our brief, even if you consider them an opinion, we still win. That's not really the defendant's argument, though. But I would say that these kinds of statements – things in accounting – You're saying even if it's opinion, they didn't believe what they were saying. Not – well, I don't know. We actually don't allege that. I don't think they did. But what we say is that the fact of the current persistency rate is a fact, which was effectively misrepresented by rolling into the financial disclosures that they made to investors during the classroom. However you describe it, that basic fact was misleading. Correct. And I think that's consistent with DiCarlo. That's consistent with the circuit's other rulings in this area. And I think that's what – accounting is basically, under GAAP, attempting to – I have the ASC provision here. But it's basically attempting to provide investors with the present value of something. I've never heard of ASC 656 until this case. But let me ask you two questions. One, with respect to what you allege to be this lower persistency data, do you allege anywhere that SelectQuote actually failed to incorporate that data that it was collecting into its disclosed financial data? We allege that based on what they said at the end of the class period, and at one point in the class period, that the persistency rate was lower over a period that began before the IPO and that those numbers caused a $205 million revision to that LTV, or long-term value, that they announced in February of 2022. So in September 2020, they announced – or someone, I guess an executive, Mr. Sidhu? Yeah, the CFO. The CFO states that the persistency rate was declining. And that softens the message a little bit. But he says it's declining. So what is the false statement? So he says it's declining, but they make qualitative statements throughout the class period that it's stable, that the business is good. And so the qualitative statement or the amount of the decline is – we allege that statement to be false because it understates the magnitude, which later became disclosed, particularly in February of 2022. So that disclosure itself, saying it's 2%, we allege that it's not 2%, and we allege that it's higher, and we allege that they admitted that effectively in February of 2022 when they took the value down of what they call the cohort, stating back the 2019 policy year, which was before they were public. And why isn't it a reasonable reading even of the complaint? This is my last question, and then you deserve some time for rebuttal. Yeah. And I think that this was maybe in the complaint somewhere or referenced in the complaint, the CFO again, who says we're not able to get the data at a certain point, and that is a problem. And because of this missing data, we – I mean, that might tell you – that might tell a reasonable investor to be careful about relying on this data, on the data that we provide. What's wrong with that? Yeah, they tout the system that they have that reportedly they get data from the carriers, the people, their clients who they're selling the insurance policies for. And we allege that that statement also is false. We spoke to a person – I think her title is, like, she was the person who was in charge of ingesting this data. Confidential, whatever. Yeah, a former employee. Former – Yeah, it's okay. You understand that the word confidential is freighted in this context. Got it. But that statement itself was false. She told us that there was never a delay of more than a week or two. And so that statement, we allege, is basically an excuse to cover, like, Oh, the persistency went down, but it was because the dog ate my homework, is effectively how I would describe that disclosure. Okay. Thank you very much. Thank you, Alex. What if the dog did eat my homework? May it please the Court, my name is David Anders, Wachtell, Lipton, Rosen and Katz, counsel for Appellee. I want to explain why the statements at issue here are clearly forward-looking statements, but I think it's useful to put this case in some context just to begin. And the MF Global case is the perfect vehicle to provide that context, and not just because that's the last time I argued in this Court was the MF Global case, but it happens to really provide perfect context. In MF Global, there was a rogue trader who broke the law, criminal investigations, CFTC investigations, obviously violated company policies, and it was the revelation of that fraud that led to the stock drop and then the securities class action that followed, which brought us to this Court after some point. And the legal issues were similar. They were application of the speaks, caution doctrine under a Section 11 claim, and whether the statements in that case involved risk disclosures, whether they were forward-looking. But the context was clear. There was a fraud, and that's what makes the MF Global case, where this Court sadly reversed and didn't agree with my argument that day, so different from the select quote case, because here the allegation is securities fraud, not just, well, there's stock drop and so we need to bring a case. And as Your Honors were pointing out, we actually know why in this case the stock dropped, and it's got nothing to do with fraud. We know from publicly available information what's in the record, the government changed the rules about when you can trade, change your insurance policy. And those changes directly. Is this in the record? Yes, Your Honor. It's all in the record, that the government changed the rules, and the timing is going to be critical, as I'll get to in a minute. The government changed the rules about how often and when you can change your health insurance. We know that consumer behavior changed, and we know that COVID had an important impact, and that affects the rule change that the government implemented. Well, can you explain that? So what was the connection between the government rule change and COVID, if any? So because of COVID, the government extended the time within which consumers could change their health insurance. So the renewal rate then. Exactly. And that's going to run headlong into the heart of the plaintiff's claim. But Your Honors touched on what happened to the other companies, select quotes competitors. All the companies in this industry, the stock dropped. I'm sorry. So just to go back to what Justice Jacobs asked about the record, is that somewhere, can we identify that? It is. So from both, you know, I don't have all the record sites at my fingertips, but from both the briefing, I mean, I think it was all, as Judge Jacobs said, the fact of the stock drops are all public record. I don't think they're in dispute. In fact, the plaintiff in their submission put in the stock chart for one of the competitors. So this is all in the record. Well, when you say in the record, you mean as a matter of judicial notice or as a matter of the record? Well, it was attached to the appendix, the joint appendix submitted for the court. Got it. In the briefing, in the appendix, or otherwise could be subject to judicial notice. I don't think there's any controversy that all three companies, at relatively the same time, suffered enormous stock drops. And if there were fraud, you would actually expect the opposite. If SelectQuote had engaged in some fraud and that was revealed, you would really expect the competitors to do better. Like, well, our competitors is a big fraud problem, so you would expect the other company's stock to go up. But that's not what happened because this has nothing to do with fraud. I'm just worried about that I would expect. Maybe I would expect, but so what? Don't I want to hear from an expert or somebody or something? Well, this gets to the core of the case, Your Honor, which is the allegations in the complaint of fraud are insufficient. And that's the reason I make this point. There is no fraud here. And this is a classic stock drop. There's no fraud alleged. There's no sufficient allegations of fraud alleged in the complaint, which is why it was properly dismissed. That's the point, Your Honor. Well, a big part of your argument on that score is that the lifetime value is an opinion because it's forward-looking. Your adversary argues, I think with real force, that that is a figure that's arrived at through provisions that are part of GAAP and that we should view those things as present facts. Now, I understand there are different components. There's a certain looseness about 606. But isn't it really convenient from the point of view of administrative law to look at a figure that is derived from GAAP as being a present statement rather than a future prediction? ASC 606, which is the applicable accounting standard, plainly allows a company, when booking its revenue, to include two parts. Both policy commissions that were already earned, the policies were sold, and that's one category. And then the second category are a prediction, an estimate into the future of renewals of those policies, up to 10 years into the future. Well, it's not. But that's the point. It's not a receivable. There are two different types of receivables. One is something that the policy's been sold and that commission's been earned. But the second— That's what you just referred to earlier. Correct. But the second type of receivable, which ASC 606 allows and, to be clear, quote, disclose to investors, that goes into its calculation of LTV, are assumed renewals into the future. That is a classic forward-looking statement. Indeed, Your Honor, in MF Global, couldn't have put it better. There is a discernible difference between a forecast and a fact, and courts are competent to distinguish between the two. A forward-looking statement, dot, dot, dot, expresses the issuer's inherently contingent prediction of risk or future cash flows. And that last part, future cash flows, that's what we're talking about here. Ten years into the future, a prediction of who's going to renew their insurance policy. And historically, people get health insurance and they don't change carriers every year. They just get the health insurance and stick with it. And that's the change that clearly happened here. And this is where I want to come back to Judge Lillian, the question about COVID, because that's why it's incorrect and, frankly, illogical to say, well, this is a present fact, which I think is what the plaintiff ultimately has to argue, because persistency is inherently forward-looking for the reasons I just explained. So the only argument they can make is, well, you knew at the time that the persistency rate for these various cohorts of policies was, in fact, lower than what you built into your calculation. And the most important part of that is the 2018, it's the second renewals. 2019, it's the first renewals of those policies. And because of COVID, the government extended the time. So while normally you can renew your policies until March, and indeed in the very first complaint in this case, that was the plaintiff's theory, was that it ended in March, your IPO is in May, and so you knew. But what it seems that they missed, but which is clear in the record, is that the government extended the time within which consumers could get, could change their policies until the end of June. And so the simple fact is. And so that has a material impact on the expected persistency rate. The data, they weren't done collecting the data exactly. And I think there was some question about whether, what exactly. It's called the COVID set. Whether that was in the record, it's joint appendix 472, is where it makes clear that consumers could change carriers all the way through the end of June. And then the third part, the third reason why the argument that this is a fraud case because you knew persistency was, in fact, lower, it's sort of the traditional failure to include sufficient allegations in a complaint. They talk about real-time data, but none of the elements of that that are required in a fraud complaint are alleged. What was the data? Who knew the data? What form did it take? If it wasn't accurate, then what did it say? And how was that different from what the persistency rate that was built into the calculations? These are all questions that are unanswered in the complaint because there are zero allegations. They talk about admissions. It was referenced a little bit. I think Your Honors can look at the plain language. There is no world in which any executive admitted that they knew persistency was lower. Just to make sure that this is clear, do you agree that we're really talking about, with respect to the forward-looking statements, the bespeaks caution doctrine? I see my time is up. May I answer Your Honors' question? Yes. With respect to the financial statements, and I don't really think it should be contested, we agree the safe harbor of the PSLRA doesn't apply, but the bespeaks caution doctrine absolutely does apply to forward-looking statements accompanied by meaningful cautionary language. And we talk in our brief extensively. We cite the language that cautions the investors. And your view is also that, I think, but I want to make sure I understand the position, that a number of these alleged misstatements are really opinions. But based on what I've heard you say, we don't have to determine whether statement X as to the financial disclosures on persistency or hiring. We don't have to determine any of those things on the distinction between an opinion and a statement. These are classic forward-looking statements. I can't think of something more forward-looking than predicting what your renewals are going to be 10 years in the future. And you may, I mean, so, Chick, you had good questions about, well, is that proper for GAAP? I guess the two responses are, one, the auditor has done nothing here. This case has been known about forever, and they've been having audited financial statements ever since. The auditor has said nothing on this topic. And then, second, if we think the auditing standard, the ASC 606, is too confusing, well, that's a totally different problem, not sort of for SelectQuote to fix, but SelectQuote properly applied the applicable accounting standard in calculating its revenues and ultimately its LTV, and that's exactly what was disclosed to investors. Go ahead. Can I ask you a very simple question? This question will be more difficult than mine. My question is, you talked about forward-looking statements. Can't, if somebody makes a forward-looking statement that they really don't believe is true, that can't be a, that doesn't matter? So, I mean, that's a tricky question. I mean, the answer is yes, however, I mean, the devil's in the deep. It doesn't matter. It can matter, but the devil's in the details, because if the statement is forward-looking, then it can't be true or false, in many cases, because it's a prediction. If it's a bad-faith prediction, then yes, that's actually true. So, it's a good faith. Let's say, yeah, it's a good faith. We assume it here. There's no way to believe it's not. To stick with the pleading standards, there are insufficient allegations in the complaint that any executive acted with bad faith in applying persistency. There just aren't any facts. You've argued that there's really no connection between the training of the agents, the salesmen, and the LTV. But Defendant Danker said at one point, and I'm going to read it because we have so many statements, he said, what I'd like to do now is spend some time on our two most important factors, why we believe select, quote, outperforms our agents and our technology, and then goes on to talk about all this terrific training that the agents get. So, didn't your client connect the performance of the agent with the performance of the company and the LTV? So, I guess I'd answer your question a little bit the other way. The complaint fails to allege any connection between the training or insufficiency, which of course is their allegation, and the impact on persistency, which is that's the crux of their case. Their case, which, by the way, isn't really in their complaint, it's in their briefing, is that you hired all these untrained salespeople, and therefore you knew persistency would go down. And as Judge Howerstein actually picked up on this point, there is no evidence or basis to draw that connection, that if you have untrained people, there's going to be a specific decline in persistency. So, that statement is fairly read as saying that the success of the company is because our salesmen are well-trained and are selling lots of policies. The CEO's statement that you... Yes. Yes. So, I'm sorry. You're saying that, at least at this stage, we couldn't draw an inference from the fact that you hire a thousand really terrible... Let's take it out of the insurance context and put it in the house mortgage context. You hire a thousand terrible, incompetent people, and you know that they're incompetent, you don't train them, and you tell them, go find us some good mortgages, and that sort of develops into a crisis. Here, I think the allegation is you hired a bunch of people who were just not trained, who were not adequately trained to deal with insurance policies, and the renewal rate, if you get an unsatisfied customer, right, because they feel that they've not been treated well by the agent, whatever it is, they are less likely to renew. I think that's the inference. But maybe I missed something. Well, I guess that's an inference, but we're not talking about mortgages. We're talking about health insurance. No, I understand. I understand, but I think it makes a difference in the inference the court's going to draw from it. And there's two problems with the inference. One, that necessarily, if you hire untrained people, people who then agree to get a health insurance, remember, that's got to be the first step. We're only talking about renewals. So you have an untrained person who, notwithstanding this lack of training, succeeds in convincing a consumer to get particular health insurance, but then in a year or in two years is going to decide, I don't like this health insurance. So maybe I should step back. What factors are relevant to determining persistency? What factors are relevant to determining what the rate is of people who renew their insurance policy on a regular basis? So I'll start with, this is something that's not in the briefing or in the appendix, or certainly there are no allegations. Maybe that's a retreat to that. There are no allegations in the complaint that bear in this question at all, but I'll try to answer it. I mean, I think some of it's common sense. It's health insurance. If your health insurance is providing the coverage that you want it to cover, you go through a year, you go to the doctor, and if you get reimbursed at a rate that you're happy with, you presumably keep it. And historically, which is what affected this industry, historically people didn't change their health insurance very much. They got it and they kept it. I think that's what happened for, I think that's what happened in this industry, is that it got much easier for consumers to change. And change leads to lower persistency. The market is reset. But so the best answer I have to Your Honor's question is, if you're happy with your health insurance, you'll keep persistency. I can't imagine, frankly, how the person who sold it to you has anything to do with it, because you're just living your life. You're not, I mean, most of us aren't thinking about the insurance broker. If anything, you're thinking about the insurance carrier, by the way, which is totally different. It's the Aetnas and United Health of the World, which is really on your mind. It's not the select quotes. Once you get the policy. We're all way over time. I'm happy to answer any further questions. Otherwise, I'm happy to rewind.  Thank you very much. Thank you. Thank you, Your Honors. I want to start where Mr. Anders ended. Persistency is defined as renewals less lapse and churn. Lapse are people who don't stop paying their policies. Churn are people who stop, who go to a different policy. And I think to Judge Gates Different policy with a different carrier. Probably with a different carrier, but a different policy. So it's no longer renewal, and you get back into this problem of the unit economics of the policy. Training, the company itself, connected training and persistency. In paragraph 112 of our complaint, this is joint appendix at 67, it says that management believes its higher persistency, it's touting its persistency over competitors, is a result of the company's better technology combined with its highly skilled agents. So the company themselves made the connection that Judge Jacobs was asking. And I think I want to talk about not health insurance, but the health insurance policies that this company was selling, which were Medicare policies. Senior citizens in the United States are entitled to have Medicare. They don't need to buy these Medicare Advantage or Medicare supplement policies. Medicare Advantage replaces their regular Medicare coverage. So they're being sold something based on, you've probably seen the ads on television for this company, they're being sold something and they get a call from an agent if they respond to that, and that agent is then required to do something that's actually kind of complicated if you think of the way managed care systems in the health care business work. Who are your doctors? Do you have more than one? What is your medicine? Is it covered? There are different policies. So the agent is then talking to a senior citizen on the telephone and saying, oh, do you have a cardiologist? Do you have a rheumatologist? Are you on diabetes medication? Are you on this? And different policies have different features. So the idea that the relationship between which policy you get and what you're directed to, not having a relationship between your likelihood to renew that policy over several years, to me, is an inference that we believe is inconsistent with what we've pled in the complaint in detail. So I want to move on to a couple of other things. I know that I only have a minute. MF Global is a great decision by Judge Jacobs. We agree that it doesn't apply to this case. It's not. I mean, it stands attested. But it's not about financial statements. We would point, Your Honors, to the Granite decision from the Northern District of California that we discussed in our case that deals with ASC-606 revenue and a similar sort of future contingent event, that that court finds it's not a forward-looking statement and found that the misstatements there were actionable. On the COVID SEP, that's the period of time extending the time period for seniors to renew or change policies in 2020. This is what Mr. Sedoon, the CFO, said, and I'll just say this and I'll sit down. He emphasized, let me state clearly, this is in September 9th of 2020. What are you reading from? This is paragraph 268 of our complaint. 268. He emphasized, let me state clearly, nothing has fundamentally changed on the persistency front in the last five months. That's on September 2020. So the COVID SEP ends on, I believe, June of 30, June 30. So this is almost three months after the COVID SEP has ended, about five months after the IPO, four months after the IPO. And he's saying the COVID SEP, which now ended almost three months ago, didn't affect our persistency. So the idea that it's COVID and that's what changed the persistency is inconsistent with what we've alleged, and we believe we're entitled not just to what we've actually alleged, but also the inferences that reasonably flow from that. I see that I'm out of time, but if Your Honors have any other questions, I'd be happy to answer. Thank you very much. Thank you. This concludes our decision.